IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEFF WOODS, | ) | CASE NO. 4:11-CV-2306 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| MICHAEL J.ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jeff Woods ("Plaintiff" or "Woods") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the Commissioner's decision should be **AFFIRMED**.

## I.  Procedural History

On June 1, 2009, Woods filed an application for disability benefits and, on June 17, 2009, he filed an application for supplemental security income.[1]  Tr. 67-70, 131-138.  Woods alleged a disability onset date of August 15, 2008.  Tr. 131, 167, 172.   He alleged disability based on diabetes, COPD, depression and low back and knee problems.  Tr. 26, 172.   After denials by the state agency initially and upon reconsideration (Tr. 67-70, 75-80, 85-87, 92-98), Woods

---

[1] The undersigned notes that the record is unclear as to whether the application for disability benefits was filed on June 1, 2009, or June 17, 2009.  However, the exact date of filing is not determinative of issues before the Court.  Tr. 67, 69, 131.

requested a hearing (Tr. 99) and, on June 8, 2011, Administrative Law Judge Hilton R. Miller ("ALJ") conducted a hearing.  Tr. 23-66.

In his June 21, 2011, decision (Tr. 6-22), the ALJ determined that Woods had not been under a disability from the alleged onset date of August 15, 2008, through the date of the decision.  Tr. 17.  Woods requested review of the ALJ's decision.  Tr. 128-130.  On September 19, 2011, the Appeals Council denied Woods' request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-5.

## II. Evidence

### A.  Personal and Vocational Evidence

Woods was born on June 26, 1968.  Tr. 131.  He is 5 feet, 9 inches tall and, at the time of the hearing, weighed approximately 325.  Tr. 64-65.  He was enrolled in special education classes.  Tr. 146-166, 267.  He ultimately received a GED.  Tr. 177.  Woods has worked in the past as a pottery mixer, general laborer, fast food worker, press operator, and material handler.[2] Tr. 47-51, 54-57, 192-195.  He is unmarried and has no children.  Tr. 38.  At the time of the hearing, Woods had been residing at a friend's home for almost four years.  Tr. 38-39.

### B.  Medical Evidence

#### 1.  Physical Impairments

##### a.  Treating physician

Dr. Mark Lewis of Warren West Community Health Center began treating Woods in June 2009 and continued to treat him through at least April 2011.  Tr. 333, 381-398, 417-430, 452-453, 459-466.  Dr. Lewis treated Woods for COPD, diabetes, obesity and back pain.  Tr. 381-398, 417-430, 452-453, 459-466.  In October 2009, Woods reported that, up until 7 months

---

[2] During the hearing, Woods was unclear as to how long it had been since he worked as a press operator so the ALJ informed the VE that he did not consider that job to be relevant.  Tr. 50.

prior, he smoked one pack per day.  Tr. 339.  In December 2009, it was noted that Woods was doing well with smoking cessation. Tr. 390. However, a few months later, Woods was still smoking.  Tr. 387.

On September 8, 2009, Dr. Lewis completed a Bureau of Disability form wherein he indicated that Woods had been diagnosed with COPD, diabetes (type 2), and low back pain.  Tr. 333.  Dr. Lewis indicated an onset date for each of the diagnoses: COPD – 2007, diabetes, type 2 – 2005, and low back pain – 1989.  Tr. 333.  Dr. Lewis indicated that Woods' prescribed medication (Novolin, Metformin, Pro Air Inhaler, and Symbicort Inhaler) had been effective.  Tr. 334.  Dr. Lewis also indicated that Woods' response to COPD therapy was good and his blood sugar was coming under control.  Tr. 334.  Dr. Lewis noted that lack of insurance had interfered with treatment.  Tr. 334.  Dr. Lewis stated that Woods' impairments imposed the following limitations on his ability to perform sustained work:  no lifting, bending, squatting, crawling, climbing, extreme temperatures or fumes; weight limit of 10 pounds.  Tr. 334.

On September 2, 2010, Dr. Lewis completed a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities" ("MSS").  Tr. 438-439.  Dr. Lewis set forth physical restrictions but did not include the average number of days that the restrictions would require Woods to be absent from work.  Tr. 438.  Dr. Lewis opined that the earliest onset date for the restrictions was August 2009.  Tr. 438.  The restrictions noted were as follows: only occasional lifting of less than 10 pounds (however in the pushing/puling section, Dr. Lewis noted that the upper extremity weight limit was 10 pounds, not less than 10 pounds); sitting less than 6 hours with ability to alternate every 30 minutes between sitting and standing; no bending; no climbing, kneeling, crouching or crawling; only occasional standing and stooping; reaching limited to frequent; no limitations on handling, dexterity, seeing, hearing or speaking; avoidance

of poor ventilation, heights, moving machinery, temperature extremes, wetness and humidity. Tr. 438-439.

### b.  Consulting physician

#### _Dr. Brian S. Gordon_

On September 19, 2009, Dr. Brian S. Gordon conducted a state agency consultative examination.  Tr. 338-355.  The physical examination revealed abnormal range of motion of the lower extremities with mild edema.  Tr. 339.   Woods' gait was normal and he used no ambulatory aids.  Tr. 339.   As part of the examination, a spirometry (pulmonary function) study was performed and an assessment was completed.[3]  Tr. 342-351.  The spirometry results revealed that Woods had "a vital capacity of 69% of normal with a FEV1 of 53% of normal" and "[f]low rates were 35% of normal, showing a mild obstructive lung defect."  Tr. 340. 346.

Based on his examination of Woods, Dr. Gordon opined that Woods "can do a limited amount of work related physical activities."  Tr. 340.  According to Dr. Gordon, Woods "can sit, stand and walk but lifting and carrying is limited to 20 pounds.  He can handle objects, hear, speak and travel.  There is no mental impairment, and the patient has a good capacity for understanding and memory, sustained concentration and persistence, social interaction and adaption."  Tr. 340.

#### _Ohio Institute of Pain Management_

On November 16, 2009, Keith P. Farrell, D.C., of the Ohio Institute of Pain Management evaluated Woods.  Tr. 357-366.  Woods' chief complaint was back and neck pain resulting from a four wheeler accident 10 years prior that he reported had become worse in early 2009.  Tr. 357, 361.  Woods said that he had received chiropractic therapy approximately 7 to 8 years prior to

---

[3] Because Woods had taken bronchodilators, a half hour prior to the test, only post bronchodilator studies were performed.  Tr. 340, 344.

his visit at the pain management institute and that treatment had helped a lot.  Tr. 358, 361.  He

also stated that certain pain medication had provided relief in the past.  Tr. 358, 361.  Woods

described his pain as constant and throbbing (Tr. 357, 361) but stated that he was able to sleep

normally.  Tr. 357.  He indicated he was unable to care for himself but also indicated that he

could perform daily activities and functioned normally.  Tr. 357.   When asked about his

mobility, Woods indicated that he was "self mobile" and, although listed as an option, he did not

indicate that he required used of a cane.  Tr. 357.  The physical examination revealed positive

findings in the lumbar spine with a plan for x-rays.  Tr. 361-363.  A lumbar spine x-ray was

performed.[4]  Tr. 364.  The x-ray showed "moderate vertebral body arthropathy with disc space

narrowing L5-S1 in addition to foraminal encroachment."[5]  Tr. 364.  Other disc levels were well

maintained.  Tr. 364.  In order to exclude an underlying disc herniation as well as thecal sac

compromise/stenosis, Dr. Bleggi noted that further investigation might be warranted with an

MRI study, clinical correlation and follow up being recommended.  Tr. 364.  Dr. Farrell

concluded his evaluation with an assessment that Woods was receiving medically necessary care.

Tr. 365.  He also noted that Woods expressed some financial obligation concerns.  Tr. 365.

### c.   Reviewing physician

On November 23, 2009, Dr. James Gahman, M.D., completed a Physical RFC

assessment.[6]  Tr.  367-374.  Dr. Gahman opined that Woods would be limited to occasional

lifting and/or carrying of 20 pounds; frequent lifting and/or carrying of 10 pounds; standing

and/or walking at least 2 hours in an 8-hour workday; sitting about 6 hours in an 8-hour

---

[4] No prior x-rays were available for comparison.  Tr. 364.  A later x-ray was taken on April 19, 2010, which
indicated an impression of "degenerative disc disease lumbar spine most prominent in the lumbrosacral level with
facet arthrosis."  Tr. 401.

[5] Dr. Albert M. Bleggi, M.D. read the x-ray and provided a report.  Tr. 364.

[6]On May 7, 2010, Dr. Nick Albert, M.D. affirmed this assessment upon reconsideration of Woods' claim, and an
alleged worsening of his disability.  Tr. 402.

workday; occasional climbing, stooping, kneeling, crouching and crawling due to obesity, abnormal range of motion and COPD; avoidance of concentrated exposure to extreme cold and heat, fumes, odors, dusts, gases, poor ventilation, etc. due to COPD.  Tr. 368-371.  Dr. Gahman's opinion was that Woods had not described limitations from his physical impairments that were more severely limiting than those set forth in Dr. Gahman's RFC.  Tr. 372.  Further, Dr. Gahman gave more weight to consulting examiner Dr. Gordon's opinions than Woods' treating physician's opinions.[7]  Tr. 373.   It was his opinion that Dr. Gordon's report was supported by objective findings whereas he felt that there was no objective evidence to support Woods' treating physician's opinion regarding work limitations.  Tr. 373.

### 2.  Mental Impairments

#### a.   Treating medical providers - Valley Counseling Services, Inc.[8]

*Laura Barnes, P.C.C.*

On June 24, 2009, therapist Laura Barnes, P.C.C., evaluated Woods.  Tr. 253-265.  Ms. Barnes' summary indicates that Woods was seeking treatment for therapy and was a previous client of the agency.  Tr. 262.  Woods' chief complaints were lack of energy, no motivation, withdrawal from others and feelings of worthlessness.  Tr. 262.  Woods denied suicidal/homicidal ideation.  Tr. 262.  He reported having difficulty sleeping and being "up and down all night."  Tr. 262.  Woods also reported that he "sometimes" had back pain.  Tr. 259.  Ms. Barnes indicated that Woods was unkempt and overweight but that his demeanor, eye contact and activity were average and his speech was clear.  Tr. 265.  Woods had no delusions,

---

[7] Dr. Gahman reviewed the opinions of Woods' treating physician from Warren West Community Health but noted that the treating physician's name was illegible.  Tr. 373.

[8] Woods received therapy services from different medical providers at Valley Counseling Services including, but not necessarily limited to, Laura Barnes, P.C.C., Dr. D. Schweid, M.D. and Dr. Ronald Yendrek.  Tr. 250-265, 290-330, 403-415, 440-443, 445-450.

aggression or hallucinations.  Tr. 265.  His thought process was blocked but his mood was

euthymic, his affect was full, his behavior was cooperative and his insight/judgment was fair.  Tr.

265.  Ms. Barnes recommended outpatient therapy.  Tr. 263.

### Dr.Schweid

On August 28, 2009, Dr. Schweid, M.D., completed an "Initial Psychiatric Evaluation."

Tr. 327-330.  Dr. Schweid reported that Woods was well groomed, had average build, demeanor,

eye contact and activity, and his speech was clear.  Tr. 328.  Dr. Schweid also reported that

Woods was not delusional or aggressive, had no hallucinations, and his thought process was

logical.  Tr. 328.  While Woods' mood was depressed, his affect was full, he was cooperative

and his insight/judgment was fair.  Tr. 329.  Dr. Schweid elaborated on the positive findings

from the mental exam and opined that Woods was "concerned, worried, mildly and chronically

depressed."  Tr. 329.  Dr. Schweid diagnosed Woods with dysthymic disorder[9] and a GAF of

55.[10]  Tr. 329.  He prescribed an anti-depressant for Woods and scheduled Woods for a follow up

appointment with Dr. Yendrek on September 23, 2009.  Tr.  330.

### Dr. Ronald Yendrek

During Woods' September 23, 2009, follow up appointment, a registered nurse

completed "Nursing Progress Notes" (Tr. 324) and Dr. Yendrek completed "Psychiatric Progress

Notes" (Tr. 325-326).   The nurse's notes indicate that Woods' dress and hygiene were ok, he

was pleasant and cooperative and he was eating and sleeping ok.  Tr. 324.  Dr. Yendrek's mental

status notes reflect that, except for Woods' mood/affect and insight/judgment, his mental status

---

[9] Dysthymic Disorder is a mood disorder with the essential feature being "a chronically depressed mood that occurs for most of the day more days than not for at least 2 years."  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 376-381.

[10] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  DSM-IV-TR, at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

was within normal limits.  Tr. 325.  Woods' mood/affect was depressed and reactive and his insight/judgment was fair.  Tr. 325.  Dr. Yendrek made no changes to the previous diagnosis, he continued Woods' medication and scheduled a follow up appointment for October 21, 2009.  Tr. 326.

Dr. Yendrek's October 21, 2009, progress notes are minimal.  Tr. 322-323.  They reflect that there were no significant changes in Woods' mental status and no change in Woods' diagnosis.  Tr. 322-323.  Dr. Yendrek made a change to Woods' medication and scheduled a follow up appointment for November 18, 2009.  Tr. 323.

Dr. Yendrek's November 18, 2009, progress notes are minimal.  Tr. 320-321.  Woods' new medication was ok and was continued.  Tr. 320-321.  Again, there were no significant changes in Woods' mental status and no change in Woods' diagnosis.  Tr. 320-321.  Dr. Yendrek scheduled a follow up appointment for January 13, 2010.  Tr. 321.

Woods' cancelled the January 13, 2010, appointment (Tr. 318) as well as the next three appointments (Tr. 312, 314, 316).

On February 9, 2010, Woods appeared for an appointment with Dr. Yendrek.  Tr. 310-311.  Dr. Yendrek indicated that the medication was ok and that there were no significant changes in Woods' mental status or diagnosis.  Tr. 310-311.

Three times in April 2010, Woods missed or cancelled appointments with Dr. Yendrek.  Tr. 408-414.  On May 18, 2010, Woods appeared for an appointment.  Tr. 406-407.  Dr. Yendrek indicated that there were no significant changes in Woods' mental status and no change in his diagnosis but switched Woods' medication back to Celexa.  Tr. 406-407.  Woods was "up – down" but "no better or worse."  Tr. 406.  A follow up appointment was scheduled for July 16, 2010, (Tr. 406) but no progress notes were completed on July 16, 2012.  Tr. 404-405.

Woods' next appointment with Dr. Yendrek was on August 25, 2010, during which Dr. Yendrek indicated that there were no significant changes in Woods' mental status and no change in his diagnosis.  Tr. 446-447.

On November 9, 2010, Dr. Yendrek completed a Mental Residual Functional Capacity. Tr.  441-443.  He rated Woods in three main areas: (1) social interaction, (2) sustained concentration and persistence and (3) adaptation.  Tr. 441-443.  In the four social interaction categories, Dr. Yendrek rated Woods' abilities as moderately impaired.[11]  Tr.  441.   In 3 out of 6 of the sustained concentration and persistence categories, Dr. Yendrek rated Woods' abilities as moderate impaired and, in 3 other categories, he rated Woods' abilities as markedly impaired.[12] Tr. 442.  In 5 out of the 6 adaptation categories, Dr. Yendrek rated Woods' abilities as moderately impaired and, in the 1 other category, he rated Woods' abilities as markedly impaired.[13]  Tr. 442-443.  In support of his opinion that Woods' condition would likely deteriorate if placed under stress of a job, Dr. Yendrek stated that Woods "has a history of depression and poor coping skills.  Woods also experiences intermittent anxiety and irritability." Tr. 443.  Dr. Yendrek indicated that Woods reported that the onset of his symptoms began 4 or 5 years prior, i.e., 2005 or 2006.  Tr. 443.

### b.  Consulting physician

#### *Dr. J. Joseph Konieczny, Ph. D., Psychologist[14]*

---

[11] "Moderate" = "Impairment affects approximately 10-20% of the claimants ability to function in an 8 hour work day."  Tr. 441.

[12] "Marked" = "Impairment affects 20-50% ability to function in an 8 hour work day."  Tr. 441. Dr. Yendrek indicated that Woods' abilities were marked in his ability to perform and complete work tasks in a normal work day or week at a consistent pace, maintain attention and concentration for more than brief periods of time, and perform at production levels expected by most employers.  Tr. 442.

[13] Dr. Yendrek indicated that Woods' ability to tolerate customary work pressures was marked. Tr. 443.

[14] As noted above, on September 19, 2009, Dr. Brian S. Gordon conducted a state agency consultative examination during which he examined Woods' physical conditions.  Tr. 338-355.  As part of his evaluation, Dr. Gordon opined

On July 20, 2009, Dr. Konieczny conducted a psychological evaluation of Woods.  Tr. 267-270.  Woods' friend drove Woods to the evaluation.  Tr. 267.  Dr. Konieczny reported that Woods appeared for his appointment unkempt and in soiled clothing but was very pleasant and cooperative throughout the evaluation.  Tr. 267-268.  Woods did not exhibit signs of impulsivity and he denied difficulty in controlling his temper.  Tr. 268.  He reported occasional episodes of mood swings and described his overall level of motivation as diminished.  Tr. 268.  Dr. Konieczny indicated that Woods seemed "quite capable of expressing himself in a clear and coherent manner."  Tr. 269.  Woods reported that his depression had been severe over the past 2 to 3 years.  Tr. 269.  He showed no signs that his ability to concentrate and attend to tasks was impaired except he had some difficulty performing a serial three subtraction test.  Tr. 269.

In sum, Dr. Konieczny opined that Woods suffered from depressive disorder, not otherwise specified.[15]  Tr. 270.  He stated that Woods' ability to concentrate and attend to tasks and his ability to understand and follow directions showed no signs of impairment.  Tr. 270.  Dr. Konieczny further opined that Woods' ability to withstand stress and pressure, his ability to relate to others and deal with the general public, his awareness of rules of social judgment and conformity and his overall level of judgment were moderately impaired.  Tr. 270.  Dr. Konieczny assessed Woods' symptom severity at a GAF level of 54 and his functional severity at a GAF level of 50.[16]  Tr. 270.  Dr. Konieczny noted that Woods' functional severity GAF level of 50 was reflective of his lack of friends and apparent intellectual limitations.  Tr. 270.

---

that Woods had "no mental impairment, and the patient has a good capacity for understanding and memory, sustained concentration and persistence, social interaction and adaption."  Tr. 340.

[15] Dr. Konieczny noted that Woods showed moderate deficits in his general fund of information and, therefore, consideration should be given to a diagnosis of borderline intellectual functioning.  Tr. 270.

[16] A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends,

### c.  Reviewing physician

### _Dr. Marva Dawkins, Ph. D._

On August 13, 2009, Marva Dawkins, Ph.D., completed a Mental RFC (Tr. 272-275) and

Psychiatric Review Technique (Tr. 276-289) in connection with Woods' disability application.

As part of the Mental RFC, Section I – Summary Conclusions - Dr. Dawkins found that Woods

was not significantly limited in 14 categories and only moderately limited in the other 6

categories. Tr. 272-273.  Dr. Dawkins rated Woods as moderately limited in his ability to

understand and remember detailed instructions; carry out detailed instructions; complete a

normal workday and workweek without interruptions from psychologically based symptoms and

perform at a consistent pace without an unreasonable number and length of rest periods; interact

appropriately with the general public; maintain socially appropriate behavior and adhere to basic

standards of neatness and cleanliness; and respond appropriately to changes in the work setting.

Tr. 272-273.

While Dr. Dawkins believed Woods' allegations were partially credible, in Section III –

Functional Capacity Assessment – he opined that the intensity of the symptoms and the impact

on functioning may not be to the extent alleged by Woods.  Tr. 274.  Dr. Dawkins noted that, at

the time of completion of the assessment, Woods was not receiving mental health treatments so a

consulting examination was ordered.  Tr. 274.  After reviewing Woods' medical records,

including Valley Counseling records and the consulting physician's psychological report, Dr.

Dawkins opined that Woods "retains the mental capacity to perform and sustain simple routine

tasks in a work setting where fast pace and production quotas are not present and also where he

has minimal contact with supervisors, coworkers and the general public."  Tr. 274.

---

unable to keep a job)."  DSM-IV-TR, at 34.   A GAF score between 51 and 60 indicates moderate symptoms or
moderate difficulty in social, occupational, or school functioning.  _Id._

As part of the Psychiatric Review Technique, Dr. Dawkins indicated that, while Woods does not have a medically determinable impairment precisely satisfying the diagnostic criteria of Listing 12.04, he suffered from depressive disorder, not otherwise specified.  Tr. 279.  Further, Dr. Dawkins rated Woods' degree of limitation in maintaining social functioning and maintaining concentration, persistence and pace as moderate and his degree of limitation in his activities of daily living as mild.  Tr. 286.  She also indicated that Woods had not experienced any episodes of decompensation.  Tr. 286.

*Dr. Paul Tangeman, Ph. D.*

On March 19, 2010, Dr. Tangeman reviewed and affirmed Dr. Dawkins' Mental RFC and Psychiatric Review Technique.  Tr. 375.  In doing so, Dr. Tangeman reviewed and reflected upon the fact that, since the date of Dr. Dawkins' reports, Woods had been seen by psychiatrist Dr. Yendrek and that Dr. Yendrek's notes showed Woods's mental status to be stable as of February 9, 2010.  Tr. 375.  Accordingly, Dr. Tangeman affirmed Dr. Dawkins' assessments.  Tr. 375.

**C.  Testimonial Evidence**

**1.    Woods' Testimony**

Woods was represented by counsel and testified at the administrative hearing.  Tr. 27-.  Woods testified regarding his physical and mental impairments.  Tr. 27-45.  He also testified regarding his past employment.  Tr. 47.  As a result of his impairments, Woods is unable to sleep for extended periods of time and cannot sit for extended periods of time.  Tr. 32.  He is up and down a lot throughout the day.  Tr. 32.  He takes 1 or 2 naps a day for about an hour each.  Tr. 33.

Woods has severe low back pain that goes down his legs and he experiences pain every day.  Tr. 27.  His pain is worse when he sits for extended periods of time which, according to Woods, is 15 to 20 minutes.  Tr. 28.  He can stand for about 10 to 15 minutes before his back starts to hurt.  Tr. 43.  On a scale of 1 to 10 with 10 being the most excruciating pain, Woods rates his low back pain to be, on average, a 6 or 7.  Tr. 28.  While not prescribed, upon recommendation of his counsel, Woods has been using a cane and, for the past three years, has used a cane daily.  Tr. 28-29, 39-40.  He has fallen in the past when not using his cane.  Tr. 28-29.

Woods testified that he has pain in his knees and rates his pain level to be about a 5 or 6. Tr. 29.  His knee pain is worse in cold weather and when he climbs up or down stairs, but he is unsure what specifically is wrong with his knees.  Tr. 29.

Woods takes medication for his COPD but does not use a CPAP machine or anything else to sleep with.  Tr. 57.  Woods testified that he uses an inhaler 5 to 6 times each day even when he is not being active.  Tr. 29-30.

Woods testified that he takes medication to control his diabetes but also testified that the medication is not effective.  Tr. 30, 43.  He testified that his diabetes is not better.  Tr. 30.  At one point, Woods was without insurance coverage and therefore without insulin to treat his diabetes.  Tr. 30-31.  His diabetes makes him really tired, his vision is blurry, he is unable to make a tight fist, and his feet burn.  Tr. 31.  He has been prescribed some prescription cream for his feet, but the cream does not really help.  Tr. 31.

As a result of his depression, Woods wants to isolate himself.  Tr. 32.  He does not want to leave the house or be around people.  Tr. 32.  Woods is unable to concentrate for a long period of time.  Tr. 33, 44.   He has received treatment for his mental impairment and has been able to

receive medication.  Tr. 32.  However, because of a lack of insurance, his ability to obtain

counseling has been limited.  Tr. 32, 45.

Prior to his alleged onset of disability in 2008, Woods worked sporadically.  Tr. 34-38.

Although he sought work, he was not always able to find work.  Tr. 35-36.  Prior to 2004, Woods

was without a driver's license for a period of time because of excessive points.  Tr. 38.  His lack

of a driver's license made his job search more difficult.  Tr. 36-37.

In the 1980s, Woods had a felony drug trafficking conviction for selling marijuana.  Tr.

52-53.

### 2.     Vocational Expert's Testimony

Vocational Expert Barbara Burke ("VE") testified at the hearing.  Tr. 45-56.   Following

Woods' clarification regarding his past employment (Tr. 47-54, 55-56), the VE described

Woods' past employment as a mixer in the pottery and porcelain industry (heavy as performed),

general laborer (unskilled, heavy as performed), fast food cook (light as performed), building

material handler (medium level as performed).  Tr. 54-57.

The ALJ asked the VE whether there would be any jobs available to the following

hypothetical individual:

> [An] individual of the claimant's age, education, work experience, and the
> residual functional capacity to lift and/or carry up to 20 pounds occasionally, 10
> pounds frequently, stand and/or walk with normal breaks for a total of about 30
> minutes at one time for a total of 2 hours in an 8-hour workday, sit with normal
> breaks for a total of about 6 hours in an 8-hour workday, occasionally climb
> ramps and stairs, no ladders, ropes or scaffolds, avoid exposure to extreme cold,
> heat, and temperature extremes, avoid [concentrated] exposure to dust, odors,
> gases, fumes, poor ventilation and other respiratory irritants, occasionally stoop,
> kneel, crouch and crawl, that further considers non-exertional limitations to work
> that is simple, repetitive and routine in a setting where fast-paced or production
> quotas are not present and where there is minimal [brief and superficial] contact
> with supervisors, coworkers and the public.

Tr. 58-59.  The VE indicated that, given the limitation of only being able to stand for a total of 2 hours in an 8-hour workday, such an individual would be limited to sedentary work.  Tr. 59. Based on the foregoing hypothetical, the VE testified that such an individual would be able to perform work as: a cashier and ticket seller.  Tr. 60.  The VE indicated that the jobs of cashier and ticket seller are customarily light and unskilled but that those jobs do exist in the labor market at the sedentary level.  Tr. 60.  She provided the number of jobs available regionally in those categories at the sedentary level.  Tr. 60.   The VE also listed the jobs of small product assembler and eye glass frame polisher, which are unskilled sedentary jobs.  Tr. 60-61.  She noted that the number of eye glass frame polisher jobs available was low regionally (50) and nationally (2,600).  Tr. 61.

Woods' attorney asked the VE whether her responses would change if the hypothetical individual, as described by the ALJ, was off task 20 percent of the time.  Tr. 62.  The VE indicated, yes, there would be no jobs available to such a hypothetical individual.  Tr. 62.  Also, in response to Woods' attorney's question as to whether her responses would change if the hypothetical individual could lift no more than 10 pounds, the VE responded that, again, there would be no jobs available to such a hypothetical individual.  Tr. 62.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable

to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his June 21, 2011, decision, the ALJ made the following findings:

1.   Woods met the insured status requirements through December 31, 2009. Tr. 11.

2.   Woods had not engaged in substantial gainful activity since August 15, 2008, the alleged onset date.  Tr. 11.

3.   Woods had the following severe impairments: diabetes, chronic obstructive pulmonary disease (COPD), degenerative disc disease, obesity and depression.  Tr. 11.

4.   Woods did not have an impairment or combination of impairments that met or medically equal one of the listed impairments.[17]  Tr. 11-13.

5.   Woods had the residual functional capacity ("RFC") to perform sedentary work except could lift 20 pounds occasionally, 10 pounds frequently; could stand or walk 30 minutes at a time for up to 2 hours total in an 8 hour workday; could sit for a total of about 6 hours in an 8 hour workday; could not climb ladders, ropes or scaffolds; only occasionally climb ramps or stairs; avoid concentrated exposure to extreme heat and cold; avoid concentrated exposure to dusts, odors, gases, fumes, poor ventilation, or respiratory irritants; only occasionally stoop, kneel, crouch or crawl; only simple, repetitive, routine work where fast paced or production quotas are not present; and only minimal contact with supervisors, co-workers and the public.  Tr. 13-16.

6.   Woods was unable to perform any past relevant work. Tr. 16.

7.   Woods was born on June 26, 1968, and was 40 years old, which is defined as a younger individual age 18-44, on the alleged date of disability.  Tr. 16.

8.   Woods had at least a high school education and was able to communicate in English. Tr. 16.

---

[17] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

9.      Transferability of job skills was not material to the determination of disability.  Tr. 16.

10.     Considering Woods' age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Woods could perform.  Tr. 16-17.

Based on the foregoing, the ALJ determined that Woods was not under a disability from August 15, 2008, through the date of the ALJ's decision. Tr. 17.

## V. Parties' Arguments

### A.      Plaintiff's Arguments

Woods' arguments are twofold.  First, Woods argues that the ALJ did not properly consider the opinions of his treating physician Dr. Mark Lewis and treating psychologist Dr. Ronald Yendrek.  Doc. 12, pp. 12-14.  Second, Woods argues that the ALJ's RFC finding is not supported by substantial evidence because the ALJ's decision was based on an incomplete vocational expert hypothetical.  Doc. 12, pp. 14-16.

### B.      Defendant's Arguments

The Commissioner argues that substantial evidence supports the weight given to the medical source opinions and that the ALJ gave good reasons for rejecting the treating sources' opinions.  Doc. 15, pp. 9-14.  The Commissioner also argues that the hypothetical question to the vocational expert was consistent with the RFC finding.  Doc. 15, pp. 14-17.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ properly applied the treating physician rule and properly relied on non-treating physician opinions.

Woods argues that the ALJ did not properly apply the treating physician rule to the opinions of Dr. Lewis (physical impairments) and Dr. Yendrek (mental impairment). Doc. 12, pp. 12-14. The ALJ gave some weight to Dr. Lewis' opinion (Tr. 15-16) and little weight to Dr. Yendrek's opinion (Tr. 15). Woods argues that the ALJ's reasons for giving less than controlling weight to the treating physician opinions are insufficient and that the ALJ improperly elevated the opinion of state agency reviewing physician Dr. Dawkins over Dr. Yendrek even though Dr. Dawkins had not reviewed the treating physician's opinion or many of his treatment records. Doc. 12, pp. 12-14.

Under the treating physician rule, an ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of

19

the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(c), 416.927(c). However, while a decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).  Contrary to *Bowen*, where the ALJ completely failed to acknowledge a treating psychologist's opinion, here, as detailed below, the ALJ not only acknowledged but also discussed Woods' treating physicians' opinions.  Furthermore, the ALJ's treatment of those opinions is supported by substantial evidence.

### *Dr. Yendrek*

On November 9, 2010, Dr. Yendrek completed a Mental Residual Functional Capacity wherein he opined that Woods had moderate to marked limitations in various categories of social interaction, sustained concentration and persistence, and adaptation.  Tr. 441-443.  Woods argues that the ALJ's basis for giving little weight to Dr. Yendrek's opinion, i.e., that Woods' mental health treatment notes do not support such limitations, was improper because it is a perfunctory statement.  Doc. 12, p. 14.  However, supportability of the opinion is a factor to be considered when determining the weight to be provided to an opinion and, as shown below, it is clear that the treatment notes, which the ALJ did consider (Tr. 15), do not support such extreme limitations.

During his initial visit with Woods on September 23, 2009, Dr. Yendrek indicated that, except for Woods' mood/affect and insight/judgment, Woods' mental status was within normal limits.  Tr. 325.  He indicated that Woods' mood/affect was depressed and reactive and his insight/judgment was fair.  Tr. 325.  Dr. Yendrek treated Woods with medication and, while he made periodic changes to Woods' medication, his treatment notes indicate that the medication

was ok. Tr. 310-311, 320-321.  Over the course of the next year, Dr. Yendrek's treatment notes were minimal and those notes reflect that there were no significant changes in Woods' mental status and he made no changes to Woods' previous diagnosis.  Tr. 320-321, 322-323, 326, 406-407, 446-447.  Dr. Yendrek's treatment records also show a number of missed appointments.  Tr. 312, 314, 316, 318, 408-414.  As such, the treatment notes do not support marked limitations and, as reflected in the RFC, the ALJ did consider and provide limitations based on Woods' mental impairment.  Tr. 13.

Woods also faults the ALJ for relying on a medical opinion of a reviewing physician (Dr. Dawkins) and giving that opinion more weight than Dr. Yendrek's opinion.  Doc. 12, p. 14.  Woods argues that Dr. Dawkins had not reviewed the treating source opinion or many of the treatment records and thus the ALJ's reliance thereon was in error.  Doc. 12, p. 14.

However, Woods' argument is faulty.   He fails to identify which treatment notes Dr. Dawkins failed to review and Dr. Dawkins' Functional Capacity Assessment reflects that she did review mental health counseling records that existed at the time of her assessment.  Tr. 274.  Although Dr. Dawkins does indicate that there was no treating source statement to consider, Dr. Yendrek had not yet seen Woods at the time of Dr. Dawkins opinion (August 13, 2009).  Tr. 274.  He first saw Woods on September 23, 2009.  Tr. 325-326.  To fault the ALJ for considering and relying on an opinion of a valid medical source on the basis that the physician's opinion did not consider an opinion not yet in existence is clearly unmeritorious.   Moreover, on March 19, 2010, after reviewing Dr. Yendrek's treatment notes wherein Dr. Yendrek indicated that Woods' mental status examination was within normal limits for all areas except for mood/affect and that medication was ok, Dr. Tangeman affirmed Dr. Dawkins' Mental RFC and Psychiatric Review Technique.  Tr. 375.   The ALJ acknowledged this affirmation by Dr. Tangeman of Dr. Dawkins'

assessment.  Tr. 15.  Since the medical source opinions that the ALJ relied upon were based on a

full review of the record at the time the opinions were issued, Woods' argument that the ALJ's

reliance upon Dr. Dawkins' opinion was in error is unpersuasive and without merit.

### *Dr. Lewis*

On September 2, 2010, Dr. Lewis offered an opinion that sets forth Woods' ability to

perform work-related physical activities.  Tr. 438-439.  As part of his opinion, Dr. Lewis opined

that Woods could only occasionally lift less than 10 pounds.  Tr. 438.  He also concluded that

Woods could sit for less than 6 hours while alternating between sitting and standing and could

never climb, kneel, crouch or crawl.  Tr. 438-439.  The ALJ provided Dr. Lewis' opinion some

weight since it is a treating source opinion.  Tr. 15-16.  The ALJ's decision to discount the

opinion was based on the ALJ's determination that the treatment records do not support extreme

limitations in lifting nor do the treatment records support Dr. Lewis' opinion that Woods could

not climb, kneel, crouch or crawl. Tr. 16.  In discounting Dr. Lewis' opinion, the ALJ, in

addition to considering the lack of support in the treatment records, also considered the fact that

Woods is capable of living on his own and taking care of himself.  Tr. 16.

Woods' argument that the ALJ erred by failing to specifically state why he did not accept

Dr. Lewis' opinion that Woods can only sit for less than 6 hours is unpersuasive.  Woods does

not identify which treatment notes or objective findings support Dr. Lewis' limitations, including

only being able to sit for less than 6 hours in a workday, and, although the ALJ did not limit

Woods to sitting for less than 6 hours, he did find that Woods was limited to sitting for a total of

about 6 hours each day.  Tr. 13.  Further, a review of Dr. Lewis' treatment notes reveals that

there is little if any support for the extreme limitations he articulated.  Tr. 381-398, 417-430,

452-453, 459-466.  Thus, the ALJ's decision regarding what weight to give to Dr. Lewis'

opinion and which limitations were supported by the record (and therefore incorporated into the RFC) is supported by substantial evidence.

While Woods was treated regularly by Dr. Lewis, records from those visits generally show alertness, no acute distress and no respiratory distress.  Tr. 382, 384, 386, 388, 390, 392, 394, 396, 398, 418, 420, 422, 424, 426, 428, 430, 453, 460, 462, 464.   There are very few treatment notes that reflect back pain.  On September 2, 2009, Woods reported back pain and the treatment notes reflect the occurrence of back spasms and a decreased range of motion.  Tr. 427-428.   On November 23, 2009, Woods reporting having low back pain for a week.  Tr. 391.  He had fallen a week prior to that visit.  Tr. 391.  Also, on April 16, 2010, Woods reported severe back pain; he had fallen while getting out of the shower.  Tr. 381.  These limited reports of back pain, which were usually associated with a recent fall, coupled with the fact that subsequent visits do not reflect ongoing back pain are insufficient to overcome the substantial evidence that supports the ALJ's decision.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (even if substantial evidence or, indeed, a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ").  Additionally, Woods' treating physician notes reflect that his impairments predate his alleged disability onset date.  Tr. 333.  In a September 8, 2009, report to the Bureau of Disability, Dr. Lewis indicated that Woods had been diagnosed with COPD in 2007, diabetes (type 2) in 2005, and low back pain in 1989. Tr. 333.  There is no explanation as to what caused these conditions to become so disabling that Woods was precluded from all work.  Tr. 333.

The ALJ clearly explained the weight he gave to the treating physician opinions and he provided "good reasons" for his decision to provide less than controlling weight to each of the

opinions.  Although the ALJ may not have included "an exhaustive factor-by-factor analysis," his decision, including his reasons for discounting the treating physician opinions, is sufficiently specific and clear to allow this Court to review his decision.  *See Francis*, 414 Fed. Appx. at 804. Additionally, as is shown by a reviewing of the entire decision, the ALJ fully considered opinion evidence as well as Woods' own subjective complaints.  Accordingly, the ALJ's decision is supported by substantial evidence and Woods' argument that the ALJ did not properly apply the treating physician rule is without merit.

**B.  The ALJ presented a proper hypothetical to the VE and, therefore, his decision, which is based in part on the VE's testimony, is supported by substantial evidence.**

Woods argues that the ALJ's RFC finding is not supported by substantial evidence because, although the ALJ gave significant weight to state agency reviewing psychologist Dr. Dawkins' opinion, the ALJ did not specifically include in the RFC and in the VE hypothetical Dr. Dawkins' opinion that Woods would be "moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." Doc. 12, p. 15.  Woods asserts that, had the ALJ included all limitations outlined in Dr. Dawkins' opinion, Woods would have been found disabled.  Doc. 12, p. 16.

On August 13, 2009, Marva Dawkins, Ph.D., completed a Mental RFC.  Tr. 272-275. The Mental RFC includes three sections: Section I – Summary Conclusions, Section II – Remarks, and Section III – Functional Capacity Assessment.[18]  Tr. 272-274.  Section III is the physician's explanation, in narrative form, of the Section I summary conclusions.  Tr. 274.  In her narrative conclusion, Dr. Dawkins opined that Woods "retains the mental capacity to perform and sustain simple routine tasks in a work setting where fast pace and production quotas are not

---

[18] Section II must be completed if the physician concludes that a category is not ratable based on available evidence. Tr. 273.

present and also where he has minimal contact with supervisors, coworkers and the general public." Tr. 274.    These limitations are encompassed in the RFC as well as in the hypothetical question posed to the VE.  Tr. 13, 58-59.  Therefore, the ALJ did not err in relying upon the VE's testimony in response to that hypothetical.

Furthermore, although the ALJ gave Dr. Dawkins' opinion significant weight, an ALJ is not required to adopt verbatim the opinion of a physician or psychologist.  The regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant medical and other evidence" of record.  20 C.F.R. §§ 404.1545(a); 416.927(a); 404.1546(c); 416.946(c), *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ – not a physician – ultimately determines a Plaintiff's RFC"); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) ("an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding").  "Hypothetical questions . . .  need only incorporate those limitations which the ALJ has accepted as credible."  *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).  Here, the ALJ's RFC is supported by substantial evidence, including the medical source opinions determined by the ALJ to be supported by the record as a whole.  Additionally, the ALJ reasonably concluded that Woods' subjective complaints were not as limiting as Woods alleged.

For the foregoing reasons, the ALJ's reliance on the VE's testimony in response to a hypothetical that incorporated the limitations that the ALJ determined were credible and that were supported by the record was proper.

## VII.  Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends that the Commissioner's

decision be **AFFIRMED**.

Dated:  October 5, 2012

_____
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).